# Laird *versus* Hiester.

1. The forms in which assessments of unseated lands are made and entered, and the mode of certifying or transmitting them to the county treasurer, are matters of official practice, entirely at the discretion of the commissioners of the several counties, subject only to the condition of being intelligible; and they must be expected to be very various.

2. The authority of the treasurer to sell unseated land for taxes depends upon the facts: that the land was unseated at the time of the assessment; that a tax appears to have been, and was in fact, assessed upon it by the proper officers; and that the tax has been due for one whole year, and remains unpaid. The absence of either of these facts involves exemption from the penalties of the Acts of 1804 and 1815.

3. This authority has been restricted by construction, in some instances, for the protection of innocent persons, who, relying on the customary forms of

[Laird v. Hiester.]

taxation, may have been led into the mistaken supposition that there was no tax charged upon *the land*, but only against the owner personally : 3 *Watts* 260 ; 4 *W. & Ser.* 133 ; 8 *State R.* 169 ; 14 *Id.* 404.

4. The tax books in the offices of the commissioners and treasurer are not intended to give notice of the liability of land for taxes ; but are merely the mode in which the tax accounts are kept ; and they are open to be corrected or proved erroneous when any interests depend upon the fact expressed by them.

5. Placing land taxes on the collector's duplicates is not, of itself, a declaration by the taxing officers that the land is seated, and has no tendency to mislead any one into the supposition that the land is not to be charged as unseated ; though a departure from a well known usage in this regard has been allowed such an effect.

6. The purpose of an inquiry into the mode in which the tax books are kept in any county is generally to show how they ought to be understood by the Court and jury ; and then it is relevant to notice the usages of the office in keeping them prior and up to the time of the entry that is to be interpreted ; but when a new usage has been introduced the older ones may cast no light upon the entries made under it.

7. When the owner of an unseated tract of land goes to the treasurer, and offers to pay to him all the taxes upon it, and does pay the amount demanded by him, and the treasurer credits the payment to another tract, and sells this, it is a good payment and the sale is void.

8. When the commissioners purchase unseated land for taxes duly assessed and unpaid, the provisions of the law saving all irregularities in the assessment and process, and giving five years for redemption, are as ample a protection to their title as that which is furnished for other cases by the limitation in the Acts of 1804 and 1824.

9. When the commissioners do thus purchase unseated land, and within or after five years allow of its redemption, and convey it accordingly, this transaction, by its very nature, discharges the public duty, rescinds the commissioners' title and revests that of the next preceding owner. If a stranger thus redeems, he discharges the public duty, without acquiring the title for himself: 4 *W. & Ser.* 298 ; 10 *State Rep.* 513.

ERROR to the Common Pleas of *Schuylkill county*.

This was an action of ejectment to June Term, 1846, by Isaac Hiester *v.* Samuel Laird, for 407 acres and 157 perches of land in *Rush* township, Schuylkill county.

The plaintiff claimed the land under a sale, on the 10th June, 1822, by the treasurer of Schuylkill county to the county commissioners, under an assessment of 400 acres in the name of John Kunkle, with no other description, for county and road taxes of 1820 and 1821, amounting to 90 cents, alleged to have been unpaid. The commissioners, on 8th December, 1827, conveyed the said tract to George Grim and Peter Zehner, and from them the plaintiff derived his claim of title.

The defendant claimed under the will of John Kunkle, his wife being a daughter of John Kunkle. The material questions were, whether the land assessed and sold in the name of John Kunkle was the land in dispute in this case ; whether it was *unseated* at the time of sale ; and if unseated, whether the proceedings relative to the assessment were such as rendered the sale by the treasurer, under which the plaintiff claimed, valid.

The land in dispute is about a mile above Tamaqua.

[Laird *v.* Hiester.]

On part of the *plaintiff* below was given in evidence the warrant to John Kunkle, which was dated 28th January, 1793, and was for 400 acres, on the branch of Nescohoning, adjoining Willing and Morris' land, near Little Schuylkill, on the east side of the road that leads from Haplinger's Mill to Berwick, and at or near adjoining land of Stonehower, in Penn township, Northampton county. A survey was made on 21st May, 1794, to John Kunkle, of 407 acres, 157 perches, &c., adjoining Peter Ashton and others. Patent to John Kunkle 12th September, 1796.

Also was offered a transcript of the triennial assessment of Rush township for 1820, at the rate of four mills. It contained as follows:—Kunckel John, 400 acres, P. 1. 05 20. 08. Signed by Kershner, assessor, and two assistants. It was stated the original paper was not in the office.

It was testified by John Dreher, who was clerk of the county commissioners in 1820 and 1821, that assessors sometimes intermixed assessments of unseated and seated land; that he perceived some unseated land on the lists for 1820 and 1821; that unseated land was generally assessed under the head of "non-residents," but not in every instance; that he found no separate list of unseated lands in those years in *Rush* township; he had no recollection of any separate list of such whilst he was clerk; there were many unseated tracts in Rush township in 1820 and 1821, and that the tract in the name of John Kunkel was not *seated* in 1820 and 1821; it is now seated.

The transcript was read, and exception was taken.

The transcript of the assessment for 1821 contained to the same effect:—Kunkel John,   400 P.,   0.05   20.   .08.

Also offered returns of *supervisors of roads*, made on the 17th March, 1821, to the treasurer for 1820 and 1821. It was testified that the road taxes in those years were returned to the county treasurer by the supervisors on unseated land to enable the treasurer to sell the land.

On it was endorsed, Return of non-residenters of Rush township, of road taxes for 1820. Returned March 26, 1821. Also, in treasurer's handwriting, " Recorded and examined."

Among others was Kunkle John, $0.10.

The transcript for road tax for 1821, was in the same way.

There was then given in evidence the list of unseated lands *by the commissioners* to the treasurer for county tax of 1821. Returned by the collector of Rush township, including Kunkle John, *unseated* $0.08. Endorsed, Entered March 5, 1822. Also from treasurer's salesbook for 1822, of unseated land, Rush township, 400 acres. Kunkle John, 90 cents tax. Sold to commissioners for $3.77.

Deed by treasurer to commissioners, dated 6th July, 1822, for a tract of unseated land, &c. Also the commissioners' record of the purchase of unseated lands by them, showing taxes from 1823

1855.] OF PENNSYLVANIA. 455

to 1827, of $5.60, on tract in name of John Kunkle. This book was made up by the clerk in 1825 or 1826.

Deed dated 8th December, 1827, from the county commissioners to George Grim and Peter Zehner, consideration stated, $14.50, on 400 acres of unseated land, late the estate of John Kunkle, in Rush township.

There was given in evidence a deed by Grim and Zehner, dated 23d January, 1830, for one-half of the tract, to Charles Frailey. Deed by Frailey and wife, 31st March, 1830, to Daniel J. Hiester. Deed dated 12th February, 1830, from Haldeman, attorney in fact of Zehner and wife, to Daniel J. Hiester and others, for one-half of the 407 acres 157 perches; and other conveyances, the last of which was by heirs of Daniel J. Hiester to Isaac Hiester, the plaintiff.

Other evidence was given with a view to show that the plaintiff took possession of the tract in dispute by erecting a house and having it occupied by tenants as early as 1831; and paid taxes from 1829 till 1839, inclusive; and that such occupancy continued till 29th October, 1838, when, it was said, the defendant induced the tenant to agree to hold under him.

On part of the *defendant* it was alleged that the land sold in the name of John Kunkle for taxes, as stated, was not the land in dispute, but a tract which was warranted to Martin Diehl, and which, it was said, was, at the time of the tax sale, known as the Kunkle land. It was situate on the Spring Mountain, at Quacake Spring, about five or more miles from the tract in dispute. It was situate mostly in Rush township—about from 30 to 50 acres of it being in Northampton county.

There was given in evidence the warrant to Martin Diehl for 400 acres, to include a spring, and adjoining Christian Kunkle and others. Patent to Martin Diehl, dated 1st August, 1795, for 406¼ acres. There was also subsequently given in evidence a copy of a deed from Northampton county, dated 4th September, 1795, by Martin Diehl to Christian Kunkle for 800 acres, including the Martin Diehl tract of 406¼ acres.

It was testified that Peter Zehner, purchaser with George Grim from the commissioners, was a supervisor of roads in 1820, and assisted to lay the road tax in that year.

*George Grim* was examined, and stated that Peter Zehner and himself made the purchase at the commissioners' sale—that *Zehner* said the Martin Diehl tract was a Kunkle tract—was Kunkle's land; and that they took Dreher and had it surveyed—that Dreher said it was Kunkle's land. Zehner said it was the tract that was assessed. John Zehner, the former commissioner, said it was the tract that was assessed and sold. He added that it was the Spring Mountain tract, and that they had it in possession three or four years, and paid taxes upon it. He said, " I found an improvement on it where Martin Diehl, it was said, lived; a chim-

ney was there, and the chimney was grown up with bushes." He further said he never knew anything about the tract *in dispute*. "I never made a bargain for any other tract except the Spring Mountain tract."

Evidence was given in order to show that in 1822, and not till 1830, the tract in dispute was not known to the officers of Rush township. It was alleged that the survey of this tract was discovered by Isaac J. Hiester, in the land office, in 1830; that, when discovered, it had been overrun by new surveys, and that about that time Daniel J. Hiester procured a deed from Grim and the attorney in fact of Peter Zehner, for the tract in dispute, the former deed being surrendered.

On part of the *defendant* was also given in evidence the record of a former action of ejectment to December term, 1838, between the same parties for the same land, in which there were two verdicts for defendant, and affirmance by the Supreme Court: See report in 1 *W. & Ser.* 245, &c.

It was offered to give in evidence all the assessments of Schuylkill county *prior to* 1823, it was said, to show that it was the practice to assess unseated land under the head of unseated or "non-residenters." The Court admitted the assessment of land *in Rush* township, but rejected the residue.

There was also offered all the assessments of *Rush* township, as was said, to show that there was no *unseated* land assessed in that township prior to 1823. The Court admitted the assessments *prior* to 1822, the year of the sale, but rejected the others.

A considerable amount of evidence was given on each side.

A question arose relative to a tax sale made in 1840, of the land in question, to John Bannan for $29.06½, taxes and costs, for the taxes of 1838 and 1839, on a regular assessment *as unseated*, to Dr. Isaac Hiester, late John Kunkle. There was no question about the regularity of this sale, and it was alleged that there was no redemption, nor the purchase-money refunded or offered to be refunded to Bannan, the purchaser, although Hiester had actual notice within the time allowed for redemption that it was sold, and that Bannan claimed the land. But the effect of the sale was disputed, because it appeared that there were two 400 acre tracts assessed to Hiester in that township, and that he owed the taxes on both; and bills of his taxes, due on both tracts, were furnished to him or his counsel, by the treasurer, prior to the sale in 1840. On one tract the taxes were $18, and on the tract in question the taxes were $25.44. W. B. Potts, for Hiester, paid the taxes on the other tract, to wit: $18, and it was marked paid; and the $25.44 was left unpaid, and the land was sold to Bannan. The inquiry was suggested whether this sale was void, because the agent testified that he intended to pay the taxes on the *Tamaqua tract*, the tract in dispute, and so stated to the treasurer; but he did not tell the

[Laird v. Hiester.]

treasurer which was the Tamaqua tract, and did not pay the amount due upon it. It was alleged that the treasurer did not and could not know which tract was the Tamaqua tract, and which was not—that Hiester only possessed that information.

Another question was made upon another tax sale of the tract in question, as the property of Hiester, by the treasurer, in 1846, *to the county commissioners*. Five years passed without redemption, and the property became the absolute property of the county. But in September, 1851, Maria K. Laird, the wife of the plaintiff, and George Newkirk, paid to the county commissioners the sum of $176.57, and received from them a transfer of their title in the usual form of a redemption, and the commissioners marked it upon their books as redeemed by these persons. A question was made whether this payment to the county commissioners resulted to the benefit of Hiester, so as to reinstate him with the title to the land.

Points were submitted on each side. Some of them, and the answers are hereafter stated.

HEGINS, President Judge, referred the question, as to the identity of the tract, to the jury. He observed that the defendant's counsel have shown that when Grim and Zehner purchased from the commissioners, Zehner supposed he was buying the Martin Diehl tract, and that they procured a copy of the official draft, had a survey made of that tract, and took possession of it, and supposed, when they sold the land purchased by them of the commissioners, that they were selling the Diehl tract, and that the purchasers supposed they were buying that tract.

He observed: "These are circumstances to be taken into consideration by the jury in determining the question of identity; but if you are satisfied from the other evidence in the cause, that Grim and Zehner and their vendees, were *mistaken* as to the tract purchased by them at the commissioners' sale, such mistake does not invalidate plaintiff's title to the land, really taxed and sold."

The first point on the part of *the defendant* was: "In order to give jurisdiction to a county treasurer to sell lands for the payment of taxes, it must appear from the assessments that the land is assessed as *an unseated tract*. There being no such designation in the assessments of 1820 and 1821, relied upon by the plaintiff in this case, the tax sale to the commissioners in 1822 is void, and the plaintiff can derive no title under that sale to any land."

The Court answered, that according to the evidence of John Dreher, it was the custom generally to assess unseated lands in a separate list, under the head of "non-residenters," but sometimes the unseated and seated lands were intermixed, and that there was no separate list of non-residenters for 1820 and 1821 in the assessments of Rush township. This irregularity in the assessments, given in evidence, is cured by the 3d section of the Act of 1804, and the 4th section of the Act of 1815, provided the

[Laird *v.* Hiester.]

land was actually unseated. The Court, therefore, answered this point in the negative.

The *sixth* point was to the same effect, and was answered in the negative.

Point 7 : The verdicts and judgments in favor of the defendant in the suit for the same land brought to December Term, 1838, finally tried in 1842, and affirmed by the Supreme Court in February, 1845, is powerfully persuasive evidence in favor of the defendant, and in case of doubt, ought to rule the verdict in favor of the defendant in this case, and more especially so if interests in the land in controversy were sold and conveyed to other parties, upon the faith of said verdicts and judgments, between the final confirmation and the bringing of this second action.

Answer 7 : " If the verdicts and judgments referred to were founded upon the same evidence substantially as that in the present case, and the jury have a reasonable doubt as to how they ought to find their verdict, then the former verdicts and judgments ought to weigh in favor of the defendant and determine their verdict. The fact that the land has since been sold and conveyed is immaterial."

Point 8 : If the tax sale to John Bannan in 1840, was a sale of the tract of land in dispute, for any taxes assessed upon it as unseated one year before, and which were not paid before the sale, such sale would convey the title of the plaintiff, and is not defeated by Potts paying the county, state, and road taxes, amounting to $18, on another tract of land assessed to Daniel J. Hiester, I. Hiester, and William Clark, and his telling the treasurer that he intended to pay the taxes on the tract at Tamaqua."

Answer 8 : " If the jury believe that William B. Potts, for the plaintiff, applied to the treasurer, on 9th March, 1840, to ascertain and pay the taxes assessed and due on the tract of land in controversy, in the name of John Kunkle, and paid the sum demanded by the treasurer, an error of the treasurer in the amount of taxes, on his entering the sum paid as a payment of taxes on another tract, cannot prejudice the plaintiff; and a sale for taxes afterwards to John Bannan would be void, even if the jury believe that the tract assessed to Daniel J. Hiester was not, and was not intended to be, the tract in controversy."

Point 9 : The tax sale to the county commissioners, if made upon an assessment as unseated, one year before the sale and of the tract in question, the taxes being unpaid and remaining unredeemed for a period of five years, vested the title in the county, and the plaintiff cannot recover.

Answer 9 : " Although the title of the county by the tax sale referred to became perfect by the failure of the original owner to redeem the land within five years, yet the commissioners, under the sanction of a decision of the Supreme Court, having conveyed the title thus acquired to those who claimed to be the original

[Laird *v.* Hiester.]

owners, by the ordinary form of a redemption deed, such conveyance will enure to the benefit of the true owner. We therefore answer this point in the negative."

The *third* point submitted on part of *the plaintiff*, with its answer, was to the following effect:

That the plaintiff is protected, under the evidence in the cause, in his title under the assessment and sale, by the limitation contained in the 3d section of the Act of 1804, and in the 4th sections of the supplementary Acts of 1815 and 1824.

Answer: "We answer this point affirmatively, provided the jury believe, from the evidence in the cause, that the land sold to the commissioners is the land in dispute."

November 17, 1853, verdict for plaintiff.

Error was assigned to the instruction as to the acts of Grim and Zehner, it being alleged that there was no mistake on their part. To the instruction that it was not material whether or not road taxes existed on the land before the sale, if the land was unseated and *county* tax was due for a year before the sale. To the answers to the defendant's 6th, 7th, 8th, and 9th points. To the answer to the *plaintiff's* 3d point. In admitting in evidence the transcript of the triennial assessment of Rush township in 1820, it being alleged that it did not purport to be an assessment of *unseated* land. 12. In admitting the returns of supervisors, which it was said were brought from the treasurer's office, and were made to the treasurer and not to the commissioners as required by law. The 13th was to the admission of a lease by one acting for the plaintiff and another, which it was said was not proved by the subscribing witness, nor authority shown to make it. 14. In rejecting part of a deposition of a witness, to the effect that when he was assessor of Rush township in 1823, he knew of no Kunkle land in that township, except that of Quacake, on which Martin Diehl lived. 15. In rejecting the assessments of the whole county *prior* to 1823. 16. In rejecting the assessments of Rush township *subsequent* to 1822. 17. In admitting the testimony of a witness, Jacob Herring, who had never held office in the township or owned land in it, who stated that he was acquainted in the township, and that John Draher, a surveyor, who it was said never lived in the township, mentioned to him about forty-four or forty-five years before, viz. in 1808 or 1809, when they were surveying for *Witman*, that a piece of land alongside was Kunkle's land. The testimony was objected to as irrelevant and as having no tendency to show what land was assessed as Kunkle's in 1820. (This is understood to have referred to the land in dispute.)

*Bannan* and *Mallery*, for plaintiff in error.—It was, *inter alia*, contended that in order to authorize a sale of land for taxes

[*Laird v. Hiester.*]

under the Acts of 1804 and 1815, the land must not only be unseated, but it must be assessed and charged, by competent authority, with the tax *as unseated;* and that the want of such an assessment was not cured by the Act of 1815. Cited 3 *Watts* 260, Owens *v.* Vanhook; 4 *W. & Ser.* 133, Larimore *v.* McCall; 8 *Barr* 169, Milliken *v.* Benedict; 2 *Harris* 404, Commercial Bank *v.* Woodsides.

*Hoffman* and *Hughes,* for defendant in error.—The controversy may be resolved into the following questions: 1. Was the land which was assessed and sold as the property of John Kunkle, the land described in the writ? 2. If so, did the assessment, in connexion with the other evidence, confer jurisdiction upon the treasurer and commissioners to sell it for taxes unpaid? And if so, is the plaintiff protected and the defendant barred, under the provisions of the 3d section of the Act of 1804, and the 4th sections of the Acts of 1815 and 1824?

The jury decided the first point in favor of the plaintiff.

It was contended, on part of plaintiff in error, that the omission of the word "unseated" or "non-residenter," in the assessment, renders the sale void. It is on the contrary contended that the omission renders the assessment merely *irregular*, and that the irregularity is cured by the provision in the 4th section of the Act of 1815, "that no irregularity in the assessment, or in the process, or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." The Act of 1815 relates to *the sale* of lands, and not to their *assessment.* In the second section of the Act of 1804, it is declared that "all unseated lands held by improvement, warrant, patent, or otherwise, shall for the purpose of raising county rates and levies, be valued and assessed in the same manner as other property." The manner and form of assessing is prescribed by the 7th and 8th sections of the Act of 11th April, 1799; by the 25th section of which all unseated land held by location, &c., "shall be valued and assessed in the same manner and form as any other property," without distinguishing the unseated from the seated. This section was repealed by the Act of 1804, in which the substance of the said 25th section is incorporated. The Acts of 1804, of 1806, 1815, and 1824, together form a system to raise and collect county rates and levies. The distinction between seated and unseated land occurs first in the sale and not in the assessment.

The intermixing of the seated and unseated land, instead of assessing them in separate lists, is but an irregularity which is cured by the Act of 1815, and such is the course of decision from the case of Stewart *v.* Shoenfelt, 13 *Ser. & R.* 360, to the case of the Diamond Coal Company *v.* Fisher, 7 *Harris* 267. There

[Laird v. Hiester.]

was cited 2 *Pa. Rep.* 496; 7 *W. & Ser.* 260; 4 *Id.* 269, 273, Frick *v.* Sterrett, a case stated to be much like the present case: *Id.* 338; 7 *Harris* 267; 1 *W. & Ser.* 245, Hiester *v.* Laird, a report of a former trial between these parties; and 1 *W. & Ser.* 333.

The case of Owens *v.* Vanhook and other cases, cited on part of plaintiff in error, are to the effect that land may lose its character of unseated by the joint act of the owners and officers of the county by treating it as seated. This is upon the principle of an arrangement to that effect.

The plaintiff in error is barred by the statute, either as it regards the treasurer's sale to the commissioners in 1822, or the sale by the commissioners to Grim & Zehner, in 1827. He neither brought suit nor took possession, while the plaintiff below took possession in 1830 or 1831, and continued till 1838, and until his possession was divested by the defendant. Cited 3 *Ser. & R.* 298, Parish *v.* Stevens; 9 *Barr* 71; 8 *Harris* 25, Shiek *v.* McElroy. In the case of Peters *v.* Heasley, 10 *Watts* 208, sales to commissioners are treated as sales to individuals.

Reply.—It is a mistake to say that the plaintiff below took actual possession of the land in question by the erection of a house, and occupying it by his tenants as early as 1831. The burden of proof showed that the house was not upon the land in dispute.

The name of the warrant is left blank in the deed. But did the assessment, in connexion with the other evidence, confer jurisdiction upon the treasurer and commissioners, to sell the land for non-payment of taxes? None of the provisions, in the Act of 1799, before the 25th, refer to *unseated* land; and that provides that "all unseated land held by location, warrant, and patent, within this state, shall be valued and assessed in the same manner and form as other property." The manner and form of the valuation and assessment is to be the same as other property, but it is to be a tax *on unseated land.* The valuation and assessment is to be in the same manner and form as other property, which indicates that it is to be a *separate* assessment, and not an assessment with seated land. The Act of 3d April, 1804, repeals the 25th section of the Act of 1799, and contains provisions for ascertaining unseated lands by requiring deputy surveyor to make returns of such; and the 2d section requires them to be valued and assessed. The assessment of land as *unseated* is indispensable to a sale. The decisions cited on part of the defendant in error do not contravene these positions.

Is the defendant barred by the 3d section of the Act of 1804, and the 4th section of the Acts of 1815 and 1824? It was contended that the limitation of five years, fixed in the Act of 1804, was not applicable to a sale by the treasurer to the commissioners.

[Laird *v.* Hiester.]

By the Act of 1804, the county commissioners could not become purchasers. The sales were to be made to individuals, and the limitation of five years applies to lands sold for taxes under the provisions of that Act; and the preamble to the Act of 1824 refers to sales under the Act of 1804; and it was not till 1851 that the right to bring an action of ejectment, as authorized by the Act of 1824, was extended to purchasers from county commissioners, when there was no actual possession. The case of Peters *v.* Heasley, 10 *Watts* 208, does not decide that the limitation in the Act of 1804 embraces sales by the commissioners.

When this case of Hiester *v.* Laird was up before, 1 *W. & Ser.* 245, there was no question made as to the validity of the assessment.

The assessment of an unseated tract, in the seated list only, is not a mere irregularity which is cured by the Act of 1815: See the authorities before referred to. An assessment of unseated land, as unseated, creates a lien upon it. The assessment and sale are a proceeding *in rem.* But an assessment of a *seated* tract creates only a debt against the owner for which he may be sued, or the goods of the occupant distrained, but no lien on the land is created: 9 *Ser. & R.* 109, Burd *v.* Ramsay. *Irregularities* are cured by the Act of 1815, but the want of assessment is not relieved from by that Act.

The opinion of the Court was delivered, August 16th, by

LOWRIE, J.—It is important to notice that the laws, to enforce the payment of taxes on unseated lands, give no directions at all relative to the mode in which any of the tax books shall be kept, except so far as they are involved in the general direction that such land "shall be valued and assessed in the same manner as other property." And though some directions are given for advertising, yet, even in this, irregularities are declared not to affect the sales; and then there is, besides, a general declaration that no irregularities in the assessment, process, or otherwise, shall be allowed to affect the title of the purchaser. Taking this thought with us in reading these laws, we readily discover the following, which are ruling principles in the present cause:—

1. The forms in which assessments of unseated lands are made and entered, and the mode of certifying or transmitting them to the county treasurer, are matters of official practice, entirely at the discretion of the commissioners of the several counties, subject only to the condition of being intelligible; and they must be expected to be very various.

This is merely an expression of the principle that allows all sorts of public functionaries to adopt and direct their own forms of fulfilling their duties, in cases wherein they are not fully and adequately directed by law. It was overlooked when it was at-

[Laird *v.* Hiester.]

tempted, 3 *Watts* 260, to indicate the form in which unseated land taxes ought to appear in the commissioners' office, and the attempt has given rise to some confusion.

2. The authority of the treasurer to sell unseated land for taxes, depends upon the facts : that the land was unseated at the time of the assessment; that a tax appears to have been, and was in fact, assessed upon it by the proper officers; and that the tax has been due for one whole year, and remains unpaid.　The absence of either of these facts involves exemption from the penalties of the Acts of 1804 and 1815.

3. This authority has been restricted by construction in some instances, for the protection of innocent persons, who, relying on the customary forms of taxation, may have been led into the mistaken supposition that there was no tax charged upon the land, but only against the owner personally : 3 *Watts* 260; 4 *W. & Ser.* 133; 8 *State Rep.* 169; 14 *Id.* 404.

4. The tax books in the offices of the commissioners and treasurer are not intended to give notice of the liability of land for taxes ; but are merely the mode in which the tax accounts are kept; and they are open to be corrected or proved erroneous, when any interests depend upon the fact expressed by them.

5. Placing land taxes on the collector's duplicates is not, of itself, a declaration by the taxing officers that the land is seated, and has no tendency to mislead any one into the supposition that the land is not to be charged as unseated ; though a departure from a well known usage in this regard has been allowed such an effect.

If the law had made the tax lists, instead of the tax laws, notice to the world of the liability of land for taxes, then, of course, the tax lists would need to possess those qualities of certainty and completeness that are appropriate to their function of giving notice.　They do not give notice of the liability, but merely define its amount.　And, if they were to stand for notice, then they ought to affect both parties ; but no matter how full, complete, and regular may be all the entries, they furnish no foundation for the faith of purchasers that is not swept away by proof that the taxes were really paid, or that the land was seated; nor do they bind the person if the land is in fact unseated.　If we say that a tax on land is no lien upon it, unless it appears in the list as unseated, or is placed upon an unseated list, then the tax is good for nothing ; for, being actually unseated, the owner is not personally liable for it.

6. The purpose of an inquiry into the mode in which the tax books are kept in any county, is generally to show how they ought to be understood by the Court and jury; and then it is relevant to notice the usages of the office in keeping them prior, and up to the time of the entry that is to be interpreted ; but when a new

[Laird *v.* Hiester.]

usage has been introduced, the old ones may cast no light upon the entries made under it.

7. When the owner of an unseated tract of land goes to the treasurer, and offers to pay to him all the taxes upon it, and does pay the amount demanded by him, and the treasurer credits the payment to another tract, and sells this, it is a good payment and the sale is void.

The unseated land laws are intended to enforce the payment of taxes, and their purpose is fulfilled when the duty is performed. If a man has really and in good faith performed his duty herein to the satisfaction of the proper officers, his land is safe. If it be sold after that, it is through the error of some officer, which cannot be visited on the owner; for the state does not mean that the owners of unseated lands shall warrant the fidelity or competency of its officers. The sale involves an assertion by the treasurer that the taxes are unpaid, and the purchaser relies upon this, or on his own investigations, and his title depends upon its truth.

8. When the commissioners purchase unseated land for taxes duly assessed and unpaid, the provisions of the law, curing all irregularities in the assessment and process, and giving five years for redemption, are as ample a protection to their title as that which is furnished for other cases by the limitation in the Acts of 1804 and 1824.

9. When the commissioners do thus purchase unseated land, and, within or after five years, allow of its redemption, and convey it accordingly, this transaction, by its very nature, discharges the public duty, rescinds the commissioners' title, and revests that of the next preceding owner. If a stranger thus redeems, he discharges the public duty, without acquiring the title for himself: 4 *W. & Ser.* 298; 10 *State Rep.* 513.

Without any further specification, the counsel will understand that these principles affirm all the important rulings involved in the charge of the learned president of the Common Pleas, and in the offers of evidence. As to the rest, it is sufficient to say that we do not perceive that there was any irrelevant or incompetent evidence admitted, or any questions of fact submitted to the jury without evidence, or any improper instructions given to them.

Judgment affirmed.

Woodward, J., dissented.